UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DANIELLE H.,

                    Plaintiff,

      v.

COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.

Case No. C23-1017-MLP

ORDER

## I.  INTRODUCTION

Plaintiff seeks review of the denial of her application for Child's Disability Insurance Benefits ("CDIB") and Disability Insurance Benefits ("DIB"). Plaintiff contends the administrative law judge ("ALJ") erred in evaluating the medical opinion evidence, vocational opinion evidence, her testimony and lay witness testimony, in assessing her residual functional capacity ("RFC"), in formulating the hypothetical to the vocational expert ("VE"), and in her additional step five findings. (Dkt. # 7.) As discussed below, the Court REVERSES the Commissioner's final decision and REMANDS the matter for further administrative proceedings under sentence four of 42 U.S.C. § 405(g).

## II.    BACKGROUND

Plaintiff was born in 1987, and suffered from severe fetal bradycardia, apnea, seizures, and perinatal asphyxia-induced static encephalopathy immediately after her birth. AR at 577-79. Plaintiff had an individualized education plan ("IEP") and received special education instruction throughout elementary school and high school. *Id.* at 606-946. While Plaintiff has no past relevant work, after high school, she attended a local college and obtained a degree in occupational and basic life skills for people with disabilities. *Id.* at 30, 77. Subsequently, in 2011, Plaintiff enrolled in a vocational rehabilitation program through the State of Washington's Division of Vocational Rehabilitation ("DVR"), in which she developed an Individualized Plan for Employment ("IPE") with the assistance of a job coach and a DVR counselor. *Id.* at 947-1032. Through the DVR program, she obtained a part-time job working at Target, where she worked from approximately 2012-2020. *Id.* at 55, 947-1032.

In July 2018, Plaintiff filed an application for CDIB, and subsequently in September 2018, Plaintiff filed an application for DIB, both of which alleged disability beginning on her date of birth in 1987. AR at 403-09. Plaintiff's applications were denied initially and on reconsideration, and Plaintiff requested a hearing. *Id.* at 99-125, 126-154. After an October 2020 hearing, the ALJ issued a decision finding Plaintiff not disabled on November 23, 2020. *Id.* at 43-64, 158-71. Subsequently, in November 2021, the Appeals Council granted review, vacated the ALJ's 2020 decision, and remanded to the ALJ for a new hearing and decision based on the ALJ's errors in evaluating the medical opinion evidence and in assessing Plaintiff as having performed past relevant work. *Id.* at 180-81. The same ALJ held another hearing in May 2022, and again found Plaintiff not disabled on June 2, 2022. *Id.* at 65-98, 15-33.

1    Using the five-step disability evaluation process,[1] the ALJ found, in pertinent part, on

2    both Plaintiff's CDIB and DIB claims that Plaintiff has the following severe impairments:

3    neurocognitive disorder, cerebral palsy, and epilepsy, and that none of the severe impairments

4    met or medically equaled a listed impairment. AR at 19. The ALJ subsequently determined that

5    Plaintiff possessed an RFC for light work with additional postural, exertional, environmental,

6    and social limitations. *Id.* at 19-21. The ALJ found that Plaintiff had no past relevant work, but

7    relying on the opinion of a VE who testified that an individual with Plaintiff's assessed RFC

8    could perform jobs existing in significant numbers in the economy, including electrical

9    accessories assembler, marker, and housekeeping/cleaner, the ALJ concluded that Plaintiff was

10   not disabled. *Id.* at 30-32.

### III.    LEGAL STANDARDS

### A.    Disabled Child's Insurance Benefits

11

12

13        Title II of the Social Security Act provides disabled child's insurance benefits based on

14   the earnings record of an insured person who is entitled to old-age or disability benefits or who

15   has died.[2] *See* 20 C.F.R. § 404.350(a). The same definition of disability and five-step sequential

16   evaluation process also governs eligibility for disabled child's insurance benefits. *See* 42 U.S.C.

17   § 423(d); 20 C.F.R. § 404.1520(a)(1)-(2). In addition, in order to qualify for disabled child's

18   insurance benefits, several criteria must be met, including, as relevant here, if the claimant is

19   over age eighteen, she must have a disability that began before she reached age twenty-two. *See*

20   20 C.F.R. § 404.350(a)(1)-(5).

21

22   _____

[1] 20 C.F.R. § 404.1520.

23   [2] Plaintiff's CDIB claim here is based on the earnings record of her mother, K.H. *See* 20 C.F.R. § 404.350(a)(5).

1

### B.        Standards of Review

2

Under 42 U.S.C. § 405(g), this Court may set aside the Commissioner's denial of social

3    security benefits when the ALJ's findings are based on legal error or not supported by substantial

4    evidence in the record as a whole. *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 (9th Cir. 2005). As a

5    general principle, an ALJ's error may be deemed harmless where it is "inconsequential to the

6    ultimate nondisability determination." *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012),

7    *superseded on other grounds by* 20 C.F.R. § 416.920(a) (citations omitted). The Court looks to

8    "the record as a whole to determine whether the error alters the outcome of the case." *Id.*

9

"Substantial evidence" is more than a scintilla, less than a preponderance, and is such

10   relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

11   *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th

12   Cir. 1989). The ALJ is responsible for determining credibility, resolving conflicts in medical

13   testimony, and resolving any other ambiguities that might exist. *Andrews v. Shalala*, 53 F.3d

14   1035, 1039 (9th Cir. 1995). While the Court is required to examine the record as a whole, it may

15   neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *Thomas v.*

16   *Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002). When the evidence is susceptible to more than one

17   rational interpretation, it is the Commissioner's conclusion that must be upheld. *Id.*

18

### IV.        DISCUSSION

19

At the outset, the Court notes that there are two different relevant periods associated with

20   Plaintiff's CDIB and DIB claims. The relevant period for Plaintiff's CDIB claim, which is based

21   upon her mother's earnings, was between Plaintiff's eighteenth and twenty-second birthdays,

22   from October 2005, through October 2009. *See* 20 C.F.R. § 404.350(a)(5); AR at 16. By

23

contrast, the relevant period for Plaintiff's DIB claim, which was based on her own earnings record, was from October 2005, through the date of the June 2022 decision. AR at 16.

### A. The ALJ Erred in Evaluating the Medical Opinion Evidence

#### 1. Legal Standards

Under regulations applicable to this case, the ALJ is required to articulate the persuasiveness of each medical opinion, specifically with respect to whether the opinions are supported and consistent with the record. 20 C.F.R. §§ 404.1520c(a)-(c). An ALJ's consistency and supportability findings must be supported by substantial evidence. *See Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022).

#### 2. August 2010 Opinion from Treating Neurologist Dr. A.T. Collins

In August 2010, when Plaintiff was twenty-two years-old, Dr. Collins, Plaintiff's treating neurologist from birth until 2015, completed a medical opinion, diagnosing Plaintiff with epilepsy, mild cerebral palsy, and mild static encephalopathy. AR at 1069. He noted Plaintiff's shyness and characterized her as a "slow learner," opining that both her shyness and her cognitive impairments impacted her personal skills and social interactions. *Id.* Dr. Collins further opined that Plaintiff would be able to participate in a training or education program to achieve the skills of "self-sustaining employment," but Dr. Collins specified that Plaintiff would require more than one year of such training to do so. *Id.* at 1070.

The ALJ found Dr. Collins' opinion persuasive, suggesting that it was supportable based on Dr. Collins' familiarity with the longitudinal record and his treatment of Plaintiff. AR at 29. The ALJ further found that the opinion was consistent with the longitudinal record.[3] *Id.*

---

[3] The Court notes that among the ALJ's reasons for finding Dr. Collins' opinion consistent with the record, the ALJ pointed to Plaintiff's "ability to engage in part-time work." AR 29. In doing so, the ALJ, however, failed to acknowledge that Plaintiff's job training and part-time work did not occur until 2011 –

Plaintiff argues that the ALJ failed to account for the portions of Dr. Collins' opinion providing that she is a "slow learner" and that she would need more than a year of training to sustain employment. (Dkt. # 7 at 5.) The Commissioner counters that the ALJ's RFC assessment may not track Dr. Collins' opinion exactly but suggests that the ALJ's assessed RFC – limiting Plaintiff to simple and occasional workplace changes – adequately accounted for Dr. Collins' opinion regarding Plaintiff's slow cognitive learning and her need for more than a year of job training. (Dkt. # 10 at 13); *see also* AR at 21. Plaintiff responds that the limitation to simple work and occasional workplace changes does not sufficiently address her slow cognitive learning, pointing to her subsequent work experience at Target, whereby despite her DVR training and the services of a job coach, she was never offered full-time work. (Dkt. # 11 at 2.)

Although an ALJ is not required to incorporate every limitation outlined in a medical opinion, the ALJ must nevertheless offer an adequate explanation for the departure. *See Betts v. Colvin*, 531 F. App'x 799, 800 (9th Cir. 2013) (holding that an ALJ erred in "according 'the greatest weight' to a medical opinion and subsequently 'disregarding aspects . . . [of the] opinion without providing any explanation'"); *see also Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008) (holding that an ALJ did not err in omitting certain limitations indicated by a medical opinion because "[t]he ALJ's opinion explain[ed] the omission of [the claimant's limitations] from the RFC finding"). Here, the ALJ failed to offer any explanation in omitting Dr. Collins' opined limitation regarding Plaintiff's need for more than one year of job training from the ALJ's assessed RFC. *See Tiffany Mae S. v. Comm'r of Soc. Sec.*, 2019 WL 5206080, at

_____

a time *after* the expiration of the relevant period for purposes of Plaintiff's CDIB claim and midway through the 2005-2022 period relevant to Plaintiff's DIB claim. *See id.* at 29. As with other issues in which the ALJ similarly relied on Plaintiff's part-time work as support for the ALJ's findings, in evaluating Dr. Collins' opinion, the ALJ failed to acknowledge both the disparate relevant time period for Plaintiff's CDIB claim (2005-2009), and how the opinion evidence pertained to Plaintiff's pre-job/pre-job training time period from 2005-2011. *See id.*

*3 (W.D. Wash. Oct. 16, 2019) (holding that the ALJ harmfully erred when he failed to address a frequency limitation in a medical opinion concerning the claimant's "ability to engage in work activity within an average schedule and work week").

The error was not harmless. As the record demonstrates, after Dr. Collins issued his opinion, Plaintiff indeed underwent DVR job training and job coaching beginning in 2011, which lasted for several years. AR at 947-1032. Despite the job training, Plaintiff was never able to achieve even "full" part-time employment at twenty hours per week – let alone *full-time* employment.[4] *Id.* at 953, 87, 80.

### 3.    October 2020 Opinion from Treating Neurologist Dr. Mark Fishel

Neurologist Dr. Mark Fishel became Plaintiff's treating neurologist in 2015, following Dr. Collins' retirement. In October 2020, Dr. Fishel completed a medical opinion in which he noted Plaintiff's diagnosed seizure disorder and "chronic neurological condition which affects her cognitive and motor function." AR at 1127. While Dr. Fishel acknowledged that Plaintiff had "made good strides and is a good worker," he nevertheless opined that he was "concerned" about Plaintiff working more than 10-15 hours per week because "any increase in work hours would result in a higher risk of seizures at work." *Id.* In support, Dr. Fishel noted that in 2014 and 2015, Plaintiff felt the early signs of seizures while working at Target and then subsequently suffered grand mal seizures both at work and home, requiring emergency medical treatment. *Id.*

The ALJ found that Dr. Fishel's opinion was not persuasive. AR at 29. In terms of supportability, the ALJ noted that Dr. Fishel was "presumably" familiar with Plaintiff's longitudinal record and had personally observed Plaintiff given his role as her treating

---

[4] Plaintiff only ever received twelve to fifteen hours per week of work from Target. AR at 1018, 87, 80.

1    neurologist. *Id.* However, without explanation, the ALJ summarily dismissed Dr. Fishel's

2    opinion that Plaintiff should be limited in her work hours as "speculative." *Id.*

3          In terms of consistency, the ALJ found that Dr. Fishel's opinion was "out of proportion"

4    to the longitudinal record, asserting that Plaintiff suffered only four seizures between 2004 and

5    2015, and then had been able to work seizure-free for five years beginning in 2015. AR at 29.

6    The ALJ further found that Dr. Fishel's opinion regarding Plaintiff's ability to work full-time

7    infringed on a matter reserved to the Commissioner. *Id.*

8          Neither the ALJ's supportability nor consistency findings are supported by substantial

9    evidence. Regarding supportability, the ALJ provided no support for her statement that Dr.

10   Fishel's opinion was "speculative" – a finding that was itself contradicted by the ALJ's own

11   preceding acknowledgement regarding Dr. Fishel's familiarity with the longitudinal record, his

12   own personal observations, and his treating relationship with Plaintiff. AR at 29. Moreover, Dr.

13   Fishel's opinion regarding the seizure risks associated with full-time work indeed spoke to

14   Plaintiff's functional limitations and did not infringe on a matter reserved to the Commissioner.

15   *See id.* at 1127.

16         Turning to the consistency findings, the ALJ erred in several respects when she failed to

17   adequately account for substantial record evidence that directly contradicted her findings.

18   Specifically, the ALJ erred regarding both the timing and the nature of the limitations associated

19   with Plaintiff's seizures when the ALJ concluded that an absence of seizures after 2015 itself

20   demonstrated that Plaintiff was able to work full-time. AR at 29. First, in so finding, the ALJ

21   ignored that Plaintiff's CDIB and DIB relevant periods collectively spanned from 2004-2022, a

22   large period of which (eleven years) preceded the 2015 cessation in seizures.[5] Second, the ALJ's

23

---

[5] As Plaintiff notes, the ALJ also likely underestimated the number of seizures that Plaintiff suffered during 2004-2015. *See* AR at 1055, 1060, 1072, 1081, 1083, 1085-86, 1087, 1127.

consistency finding ignores that it was not only the seizures themselves, but the *risk* of seizures that posed functional limitations. There was no dispute that Plaintiff suffered from severe epilepsy, both prior to and after 2015. Plaintiff and her parents were warned by her neurologists that an increase in Plaintiff's work hours – and the increased stress brought to Plaintiff given her severe impairments – itself presented a *risk* of grand mal seizures. *Id.* at 1127-28, 55. Additionally, there was also no dispute that Plaintiff had ever only worked part-time, a fact that supported rather than undermined Dr. Fishel's opinion. *Id.*

The ALJ's error in evaluating Dr. Fishel's opinion was not harmless because it impacted her subsequent evaluation of Plaintiff's RFC and her step five findings.

4.      *December 2018 Opinion from Examining Psychiatrist Dr. Justin Stamschror*

In December 2018, psychiatrist, Dr. Justin Stamschror, reviewed Plaintiff's medical records, examined her, and performed several mental and cognitive tests prior to diagnosing Plaintiff with neurocognitive disorder. AR at 1112-16, 1115. In pertinent part, Dr. Stamschror opined that Plaintiff's "ability to interact with coworkers and superiors and the public and to adapt to the usual stresses encountered in the workplace is likely quite poor based on the claimant's interpersonal presentation." *Id.* at 1115. Dr. Stamschror additionally opined that Plaintiff's "ability to perform work activities on a consistent basis without special or additional instructions is . . . likely impaired, based on [her] performance on the cognitive exam." *Id.*

The ALJ found Dr. Stamschror's opinion only "partially persuasive." AR at 26. The ALJ acknowledged factors relevant to supportability, but ultimately failed to decide the issue. *Id.* (noting that "[w]hile Dr. Stamschror did not have an opportunity to review [Plaintiff's] updated medical record, he did have an opportunity to examine [Plaintiff]," although "he was not able to examine [Plaintiff] prior to her attaining age twenty-two"). Regarding consistency, the ALJ

found Dr. Stamschror's opinion "generally consistent" with the exception of his opined

limitations concerning Plaintiff's need for special or additional instructions and her ability to

interact with others. In rejecting those limitations as inconsistent with the record, the ALJ found,

absent any citation to the record, that the record demonstrated that Plaintiff "worked closely with

a job coach for an extended period while learning her job at Target" and that Plaintiff herself

testified that "she ha[d] no interpersonal issues with coworkers, supervisors, or the public while

employed [at Target] for [eight] years." *Id.* at 27.

Plaintiff contends that the ALJ erred in rejecting Dr. Stamschror's opinion regarding her

ability to interact with coworkers, supervisors, and the public, and in ignoring Dr. Stamschror's

opinion regarding Plaintiff's need for special and/or additional instructions. (Dkt. # 7 at 9-11.)

The Commissioner counters that the ALJ's RFC, which provided that Plaintiff "can adapt to

simple, occasional workplace changes" with occasional and superficial interaction with the

public and superficial interaction with coworkers adequately accounted for the two challenged

opined limitations. (*Id.* at 15.)

The Court disagrees that the ALJ's assessed RFC inherently accounted for Dr.

Stamschror's challenged limitations by limiting Plaintiff to simple, occasional changes and

superficial interactions. The Commissioner mischaracterizes and oversimplifies the record

evidence in conjunction with the ALJ's rejection of Dr. Stamschror's opinion regarding

Plaintiff's ability to interact with supervisors, ignoring the role that Plaintiff's shyness and

"childlike" demeanor places on her ability to interact with others. (Dkt. # 7 at 15); AR at 1114,

1018, 959. Additionally, the ALJ failed to adequately address Plaintiff's need for special

instructions as required by her cognitive limitations. Neither of these errors were harmless, and

1    the ALJ is required to reconsider Dr. Stamschror's medical opinion on remand, paying special

2    attention to the two challenged limitations.

3              5.      *December 2018 Opinion from Examining Physician Dr. James McKown*

4         Dr. McKown reviewed medical records and performed a physical examination in

5    diagnosing Plaintiff with static encephalopathy, epilepsy with generalized tonic-clonic seizures,

6    cerebral palsy, and cognitive issues in December 2018. AR at 1107-10. Dr. McKown opined that

7    Plaintiff possessed the functional capacity to sit and stand and/or walk for at least six hours per

8    day, that she could lift and/or carry ten pounds frequently and twenty pounds occasionally, and,

9    among other postural limitations, that she was only able to climb and/or balance occasionally. *Id.*

10   at 1110. Dr. McKown also opined that Plaintiff was able to reach frequently. *Id.* The ALJ found

11   that Dr. McKown's opinion was persuasive but rejected his limitation regarding reaching. *Id.* at

12   26.

13        Plaintiff argues that the ALJ erred in her evaluation of Dr. McKown's opinion when she

14   failed to "engage in a substantive analysis" of the supportability and consistency factors. (Dkt.

15   # 7 at 13.) Plaintiff further contends that the ALJ erred in rejecting Dr. McKown's reaching

16   limitation, finding that Plaintiff possessed a "normal range of motion in her shoulders with

17   normal strength." (*Id.* at 14 (citing AR at 26).) The Commissioner counters that, under *Kaufmann*

18   *v. Kijakazi*, the ALJ provided sufficient record citations elsewhere in her decision to support her

19   supportability and consistency determinations regarding Dr. McKown's opinion. (Dkt. # 10 at 16

20   (citing 32 F.4th 843, 851 (9th Cir. 2022)).)

21        The Commissioner overlooks that the ALJ again made no supportability findings

22   regarding Dr. McKown's opinion. *See* AR at 26. While the ALJ noted factors both in support of

23   and against supportability, the ALJ failed to resolve the issue. *See id.* (noting that while Dr.

1   McKown examined Plaintiff in 2018, he "did not have an opportunity to review the updated

2   medical record" or to examine Plaintiff prior to her twenty-second birthday). The absence of a

3   supportability finding is not itself fatal, though, because a finding that Dr. McKown's opinion

4   lacked consistency, if supported by substantial evidence, may itself constitute a sufficient basis

5   for the ALJ to conclude that Dr. McKown's opinion was unpersuasive. *See Woods*, 32 F.4th at

6   792-94 & n.4 (consistency and supportability constitute two distinct factors that should be treated

7   separately). However, to the extent the Commissioner suggests the Court should scrutinize other

8   portions of the ALJ's decision and manufacture a supportability finding where none exists,

9   neither *Kaufmann* nor any other Ninth Circuit precedent permit the Court to make such *post hoc*

10  findings for the ALJ. *See, e.g., Makenzie M. v. Comm'r of Soc. Sec.*, 2022 WL 2817086, at *1

11  (W.D. Wash. July 19, 2022) (rejecting similar argument regarding *Kaufmann* and citing *Bray v.*

12  *Comm'r of Social Sec. Admin.*, 554 F.3d 1219, 1225-26 (9th Cir. 2009)) (court reviews ALJ's

13  decision "based on the reasoning and factual findings offered by the ALJ – not post hoc

14  rationalizations that attempt to intuit what the adjudicator may have been thinking"). Given the

15  absence of a supportability finding, the outcome depends on the ALJ's analysis of the

16  consistency factor.

17       Regarding consistency, the ALJ found that Dr. McKown's opinion was consistent with

18  the longitudinal record, citing "abnormal physical examination findings such as decreased

19  coordination and right side weakness; brain workup indicative of an underlying structural

20  abnormality, longitudinal examination findings that indicate a normal range of motion in

21  [Plaintiff's] musculoskeletal system with no significant left side weakness; and evidence that her

22  seizure condition is stable and well[-]controlled with medication." AR at 26. The ALJ, however,

23  failed to provide any record citations in support of those findings, and the Commissioner does

not specify where in the ALJ's decision the corresponding record citations may be found.

(Dkt. # 7 at 16); AR at 26. Nevertheless, in accordance with *Kaufmann,* the Court has reviewed

"the ALJ's full explanation" for rejecting Dr. McKown's opinion, "scrutiniz[ing] all of the pages

of [the] ALJ's decision," yet the record support for the ALJ's consistency finding remains

unclear. 32 F.4th at 851. Accordingly, the ALJ's consistency finding was not supported by

substantial evidence. *See Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1103 (9th Cir.

2014) ("Although the ALJ's analysis need not be extensive, the ALJ must provide some

reasoning in order for us to meaningfully determine whether the ALJ's conclusions were

supported by substantial evidence."); *see also Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir.

1991) (explaining that "a reviewing court should not be forced to speculate as to the grounds for

an adjudicator's rejection" of certain evidence). The error was not harmless because it is unclear

that the ALJ's RFC assessment, the VE hypothetical, and the VE's proffered jobs at step five

would remain the same had the ALJ properly evaluated Dr. McKown's opinion, including

crediting Dr. McKown's opined reaching limitation.

On remand, the ALJ must reconsider Dr. McKown's opinion and provide explicit

supportability and consistency findings. In doing so, the ALJ should specifically reconsider and

explain the bases for her related finding that Plaintiff possessed "normal strength."[6]

> 6.  *January and April 2019 Opinions from Non-Examining Psychologists,*
> *Drs. John Gilbert and Jan Lewis*

In January and April 2019, state agency non-examining psychologists, Drs. John Gilbert

and Jan Lewis, found on initial review and reconsideration, respectively, that Plaintiff was

unable to establish a medically determinable cognitive impairment for purposes of her CDIB

---

[6] The ALJ's finding that Plaintiff's physical examinations demonstrated "normal strength" is contradicted by her immediately preceding finding regarding Plaintiff's "right side weakness." AR at 26.

claim due to insufficient evidence from 2005-2009. AR at 120, 122-23, 150-51. However, both Drs. Gilbert and Lewis found for purposes of Plaintiff's DIB claim that Plaintiff suffered from, at most, moderate limitations due to her cognitive impairments. *Id.* at 109-11, 139-41. Both Drs. Gilbert and Lewis opined that Plaintiff "can perform [simple, routine tasks] and while she would have some limitations in her [concentration, pace, and persistence], she would still be able to sustain these tasks in a forty[-]hour workweek." *Id.* at 110, 140.

The ALJ found not persuasive Drs. Gilbert's and Lewis' determinations that there was insufficient evidence for purposes of Plaintiff's CDIB claim, noting that although there were "limited medical records, records exist that show likely cognitive deficits support[ing] a finding that her impairments existed since birth and were, therefore, medically established prior to [Plaintiff] attaining age [twenty-two]" in 2009. AR at 28. However, the ALJ found persuasive both Drs. Gilbert's and Lewis' opinions regarding Plaintiff's functional limitations associated with her DIB claim.[7] *Id.*

Like Dr. McKown's opinion, Plaintiff similarly argues that the ALJ failed to engage in "any meaningful analysis" of the supportability and consistency factors, and that the ALJ similarly failed to cite to the record in support of the findings that the ALJ made. (Dkt. # 7 at 13.) Plaintiff further contends that the ALJ erred in failing to explain why Drs. Gilbert's and Lewis' opinions were more persuasive than those of treating and examining physicians. (*Id.*) In opposition, the Commissioner mistakenly assumes that the ALJ rejected Drs. Gilbert's and Lewis' opinions regarding *both* the CDIB and DIB claims. (Dkt. # 10 at 19.) The Commissioner

---

[7] As noted, Plaintiff's DIB claim, by contrast, spanned the period from 2005 until the date of the ALJ's 2022 decision. The ALJ did not, however, address the overlapping nature of Plaintiff's CDIB and DIB claims (2005-2009) in evaluating Drs. Lewis' and Gilbert's opinions.

thus fails to address the ALJ's evaluation of the opinions as they pertained to Plaintiff's DIB claim and/or Plaintiff's related arguments. (Dkt. ## 10 at 19, 11 at 6.)

Like the evaluation of Drs. Fishel's and McKown's opinions, the ALJ failed to make a supportability finding as to both Drs. Gilbert's and Lewis' opinions. AR at 28. Regarding consistency, however, the ALJ found that the opinions were consistent with the longitudinal record, including "treatment and examination notes indicating occasional comprehension difficulties; formal mental status testing demonstrating some cognitive deficits but nevertheless consistent with the performance of simple[,] routine tasks; [Plaintiff's] overall ability to interact appropriately with providers; and [Plaintiff's] ability to engage in part-time work activity." *Id.* Again, though, the ALJ provided no record citations in support of her findings regarding Drs. Gilbert's and Lewis' opinions, and the support for the findings is not apparent from the Court's review of the decision as a whole. *Id.*; *see also Kaufmann*, 32 F.4th at 851. As discussed above, the Ninth Circuit's decision in *Kaufmann* does not require the Court to guess regarding the ALJ's intended support for the consistency finding. *See Makenzie M.*, 2022 WL 2817086, at *1; *see also Jeanna M. B. v. Comm'r of Soc. Sec.*, 2022 WL 2045602, at *2-3 (W.D. Wash. June 7, 2022) (citing *Bunnell*, 947 F.2d at 346) (explaining that in order "to engage in meaningful appellate review, . . . a reviewing court should not be forced to speculate as to the grounds for an adjudicator's rejection" of certain evidence)).

In sum, for the reasons above, the ALJ harmfully erred in evaluating medical opinion evidence from Dr. Collins, Dr. Fishel, Dr. Stamschror, Dr. McKown, Dr. Gilbert, and Dr. Lewis. On remand, the ALJ is required to reconsider and reevaluate the opinions as set forth above.

1

2

3

### B.   The ALJ Erred in Failing to Address Evidence from Plaintiff's Vocational Counselor and Job Coach

Plaintiff also argues that the ALJ erred when she failed to evaluate opinions from her DVR vocational counselor and job coach. (Dkt. # 7 at 11-12.) At the outset, the Court notes that although the parties refer by name only to DVR counselor, Adriana Tossini, review of the vocational opinions and statements cited by Plaintiff demonstrates that they are from both Plaintiff's DVR counselor, Ms. Tossini, and Plaintiff's job coach, Diane King. *See* AR at 989; *see also id.* at 1014-24 (2012 outcome reports naming Adriana Tossini as Plaintiff's DVR counselor, but signed by Diane King, Plaintiff's Mainstay job coach).

Ms. King's and Ms. Tossini's statements and opinions were prepared in conjunction with Plaintiff's participation in a state vocational program for young people with disabilities. AR at 947-1032. From 2011-2014, Plaintiff worked with the DVR vocational counselor and the job coach, who helped Plaintiff prepare for, obtain, train, and retain a part-time job as a retail clerk at Target.[8] *Id.* at 947-1032, 83. Plaintiff cites to several DVR assessments, reports, and case notes that she contends the ALJ should have considered in assessing her RFC, each of which the Court addresses in turn below. (Dkt. ## 7 at 11-12 (citing AR at 976-92, 1006-31), 11 at 5-6.)

In August 2011, Ms. Tossini advised Plaintiff that DVR found her eligible for its services. AR at 947-48. Based on her review of Plaintiff's medical, educational, and vocational records, Ms. Tossini assessed (on behalf of DVR) Plaintiff's functional skills prior to Plaintiff's enrollment in the program. *Id.* at 991-92, 1004, 1012. Ms. Tossini concluded that Plaintiff satisfied the criteria for individuals with the "most significant disabilities," which is defined by DVR as individuals who:

> experience[] serious limitations in four or more functional areas (mobility, cognition, and learning (self-direction), self-care, interpersonal communication,

---

[8] Plaintiff's mother, K.H., completed the application for the job training program for Plaintiff.

work tolerance, work skills) in terms of an employment outcome[,] and [who] [r]equire[] multiple vocational rehabilitation sources (two or more) over an extended period of time to become employed.

*Id.* at 1004.

In that assessment, Ms. Tossini also described Plaintiff's numerous functional limitations, both physical and cognitive, pertaining to Plaintiff's mobility, work tolerance, communication, cognition and learning, and work skills. AR at 991-92. Ms. Tossini noted, in particular, that Plaintiff processes information very slowly, experiences "visual-perceptual difficulties," and has difficulty with fine motor skills. *Id.*

Subsequently, in June 2012, several months after Plaintiff was first employed by Target, Ms. Tossini noted difficulties that Plaintiff was experiencing at work, including with information retention and with interactions with customers and coworkers. AR at 984 (noting Plaintiff was having difficulty with "spatial awareness;" was "walking around [Target] randomly;" had "poor retention" regarding the location of different departments and items; was unknowingly mimicking what other people said; and that Plaintiff was "like a deer in headlights" when customers asked her a question). As a result of her difficulties, Plaintiff's job coach, Ms. King, drew her a special map of the store. *Id.* Ms. Tossini stated that the job coach was working "very hard with [Plaintiff] but it [is] challenging." *Id.* Later that month, as a result of Plaintiff's "significant difficulty learning [the] necessary skills to be successful at Target," Plaintiff's job coach asked her parents to come and observe Plaintiff at work so that they were able to practice with her at home. *Id.* at 983. Ms. King observed that Plaintiff's subsequent practice with her parents made "a huge difference." *Id.*

On August 22, 2012, Plaintiff successfully completed her ninety-day probationary period with her employer, Target. AR at 1017. Ms. Tossini and Ms. King, along with Plaintiff's

1    supervisor at Target, opined collectively regarding additional future goals for Plaintiff, which

2    could help increase the likelihood that Target would offer her a twenty-hour workweek – as

3    opposed to the twelve to fifteen hours she was then working. *Id.* at 1017-18. Those goals

4    suggested that Plaintiff better learn where items and departments were located within the store,

5    initiate conversations to ask customers if they need help, and communicate better with

6    supervisors. *Id.* A September 2012 case note from Plaintiff's job coach provided that even

7    though Plaintiff had completed her probationary period, "she would greatly benefit from

8    additional job coaching to meet employer standards and for the job coach to advocate on her

9    behalf for additional work hours." *Id.*

10          In January 2013, Plaintiff's job coach noted that she continued to work numerous hours

11   at Target "side by side with [Plaintiff] to demonstrate different skills and techniques." AR at

12   957. At that time, Ms. King opined that Plaintiff satisfied the essential functions of her job and

13   met her employer's expected levels of job performance, having "made great improvements" and

14   "blossomed into a more confident and productive team member." *Id.* at 957-959. Nevertheless,

15   Ms. King also opined that Plaintiff continued to be "nervous or afraid" to approach customers

16   and coworkers, and that "given [Plaintiff's] somewhat timorous personality and weak ability to

17   advocate for herself, she could encounter issues around new coworkers, team leaders, and store

18   managers." *Id.* at 959. In April 2014, DVR subsequently closed Plaintiff's case, noting that all

19   post-employment services had been provided and that Plaintiff was meeting all the requirements

20   necessary to maintain her employment at Target. AR at 953.

21          The ALJ failed to account for the opinions and statements made by Ms. Tossini and Ms.

22   King. *See* AR at 25 (citing Ms. King's January 2013 case notes, which the ALJ asserted

23   evidenced that Plaintiff "was able to perform tasks such as folding and straightening clothes,"

could have "superficial interaction with the public" and could "maintain a schedule" to discount

Plaintiff's testimony); *but see id.* at 24 (citing Ms. King's January 2013 statement regarding

Plaintiff's timidity).

Plaintiff argues that the ALJ erred in failing to substantively address the vocational

opinions given that they "included significant evidence about how Plaintiff's impairments impact

her ability to work." (Dkt. # 7 at 11-12.) The Commissioner counters that the ALJ was not

required to discuss the vocational opinions because they constituted "nonmedical" source

statements, as opposed to medical opinions. (Dkt. # 10 at 9-10.) Moreover, the Commissioner

further suggests that the vocational opinions were not relevant to Plaintiff's RFC because they

did not address her functional limitations. (*Id.* at 11.)

The Commissioner mischaracterizes the vocational opinions and statements as failing to

address Plaintiff's functional limitations because, as described above, those limitations were

precisely what the opinions addressed. *See, e.g.*, AR at 991-92, 1004, 1012. Moreover, under the

2017 regulations, an ALJ remains obligated to determine RFC based upon all relevant evidence

of record, including observations made by a claimant's family, neighbors, friends, or other

person. *See* 20 C.F.R §§ 404.1454(a)(1), 404.1545(a)(3). That an ALJ can disregard or reject

relevant lay witness evidence for no reason is inconsistent with the Commissioner's obligation to

consider such evidence, and the rule the ALJ must provide some rationale in order for the Court

to meaningfully determine whether the ALJ's conclusions are free of legal error and supported

by substantial evidence. *See, e.g.*, *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001).

Finally, the ALJ and the Commissioner overlook that even though Ms. Tossini's and Ms.

King's opinions did not constitute "medical opinions" under 20 C.F.R. § 404.1513(a)(2), because

they were not from a "medical source," the ALJ was nevertheless required to consider them

pursuant to the pertinent Social Security Ruling governing cases involving young adults between the ages of 18 and 25. *See* Social Security Ruling ("SSR") 11-2p, *Titles II and XVI: Documenting and Evaluating Disability in Young Adults*, 2011 WL 4055665, at *1 (Sept. 12, 2011).[9] The majority of Ms. Tossini's and Ms. King's opinions and statements were prepared prior to Plaintiff's twenty-fifth birthday in October 2012, when Plaintiff was considered a "young adult." *See id.* at *2 (defining young adult as ages eighteen to approximately twenty-five years-old). Moreover, Ms. Tossini's and Ms. King's case notes and opinions constitute the very type of evidence that SSR 11-2p required the ALJ to consider in a case like this one, especially given that Plaintiff previously attended special education classes, had an IEP throughout her

---

[9] Notably, SSR 11-2p instructs ALJs to consider evidence from other sources who are not medical sources, "but who know and have contact with the young adult [and] can help [the ALJ] evaluate the severity and impact of a young adult's impairment(s)," including "family members, educational personnel (for example, teachers and counselors), public and private social welfare agency personnel, and others (for example, friends, neighbors and clergy." 2011 WL 4055665 at *5. The Ruling specifically requires an ALJ to consider "community experiences, including job placements," "psychosocial supports and highly structured or supportive settings," and "extra help and accommodations." *Id.* at *6-10.

Significantly, the Ruling notes the differences between structured and supportive settings and "real world" work as follows:

> The young adult's ability to function in settings that are less demanding, more structured, or more supportive than those in which people typically work does not necessarily show how the young adult will be able to function in a work setting . . . The more extra help or support of any kind that a young adult receives because of his or her impairment(s), the less independent he or she is in functioning, and the more severe we will find the limitation to be.

*Id.* at *7. Accordingly,

> If a young adult can function only if he or she receives more help than would generally be provided to people without medical impairments, we consider how well the young adult would function without the extra help. The more extra help or support of any kind that a young adult receives because of his or her impairment(s), the less independent he or she is in functioning, and the more severe we will find the limitation to be.

*Id.* at *8.

ORDER - 20

schooling, and was considered a "young adult" for the entire relevant period of her CDIB claim

and for much of the relevant period for her DIB claim as well. The ALJ's failure to consider the

vocational opinion evidence was not harmless because it impacted the ALJ's subsequent

assessment of Plaintiff's RFC and her step five findings.

### C.   The ALJ Erred in Evaluating Plaintiff's Testimony and the Lay Witness Testimony from Plaintiff's Mother

#### 1.   Plaintiff's Mother's Testimony

Plaintiff's mother, K.H., testified at the 2020 and 2022 hearings, submitted a September

2018 third party function report, and also completed a September 2018 "Seizures Questionnaire"

on Plaintiff's behalf for the State of Washington's Department of Social and Health Services

("DSHS"). AR at 469-79 (seizure questionnaire); *id.* at 457-64 (third party function report); *id.* at

81-90 (May 2022 testimony); *id.* at 54-58 (October 2020 testimony).

K.H. attested that Plaintiff has had epilepsy and cerebral palsy since birth, and that she

has always lived at home with her parents because she is unable to live independently. AR at

457, 81-82. K.H. testified that Plaintiff has both cognitive and physical challenges due to her

impairments, and she described Plaintiff as cognitively "slow." *Id.* at 84, 87. K.H. explained that

Plaintiff has difficulty "formulating a verbal response to a question and articulating what she's

thinking," and also in recognizing a problem and figuring out how to deal with it. *Id.* at 82, 87.

Plaintiff's conversation can be "rambling, halting, weak, pressured, and illogical" at times. *Id.* at

86. Instructions need to be broken down and repeated. *Id.* at 462. Plaintiff has a difficult time

with stress and changes to her routine. *Id.* at 463.

Plaintiff is unable to have a driver's license due to her cognitive and physical

impairments, and her parents prefer to drive her places because she has trouble remembering the

1   proper bus stop to disembark. AR at 85, 460. Plaintiff is unable to manage her own finances, and

2   her parents do her grocery shopping. *Id.* at 460.

3        Physically, Plaintiff has challenges with her fine motor skills, lacks endurance and

4   strength, is atrophied and weaker on her right side, and has trouble balancing and reaching

5   because of her cerebral palsy. AR at 82, 84. As a result, Plaintiff is unable to turn on the stove or

6   to complete chores like cleaning a bathtub, which require balancing and reaching on her right

7   side. *Id.* at 82, 84-85. Plaintiff is also unable to help her parents with heavy housework or

8   yardwork because she lacks sufficient physical strength due to her cerebral palsy. *Id.* at 450.

9        Plaintiff also suffers from epileptic grand mal seizures, which began when she was an

10  infant. AR at 469. During a typical seizure, Plaintiff will lose consciousness, become

11  unresponsive, her arms and legs will "jerk," her lips turn blue, and her eyes roll back into her

12  head. *Id.* K.H. witnessed multiple seizures over the years, and, as of the 2022 hearing, Plaintiff's

13  last known seizure occurred in October 2015, while Plaintiff was working at Target. *Id.* Plaintiff

14  has been taking medications daily for her seizures since birth. *Id.* at 470. At the 2020 hearing,

15  K.H. testified that Plaintiff was on a high dose of medication that had been controlling her

16  seizures since 2015. *Id.* at 55. However, K.H. added that, typically, Plaintiff experiences a

17  "breakthrough seizure" at some point, thus requiring new and different medication. *Id.* Plaintiff's

18  neurologist recommended to K.H. and Plaintiff's father that Plaintiff not work any more than ten

19  to fifteen hours per week because that would increase her risk of seizures. *Id.*

20       K.H. also testified regarding Plaintiff's job training and her work at Target from

21  2012-2020. Plaintiff was unable to complete the program application on her own, so her parents

22  helped her apply to the job training program and to obtain a job coach. AR at 83. Although

23  Plaintiff was able to obtain a part-time job at Target, the employer did not offer her additional

1   hours because Plaintiff "wasn't fast enough." *Id.* at 87. K.H. opined that, in addition to Plaintiff's

2   risk of seizures, she is also unable to work full-time due to her physical lack of endurance and

3   strength, her cognitive slowness, and her reduced ability to handle stress. *Id.* at 87, 57.

            2.      *Plaintiff's Testimony*

5           At the time Plaintiff testified at the 2020 hearing, she was not represented by an attorney,

6   but advised the Court that she did not want additional time to obtain an attorney because she

7   wanted her mom to represent her.[10] AR at 47. The Court admonished Plaintiff during the hearing

8   not to look to her parents for answers. *Id.* at 51.

9           Plaintiff testified that she had been on seizure medications since birth, but that she had

10  not experienced a seizure since 2015, when she suffered from a grand mal seizure, and thereafter

11  required a significant change to her seizure medications. AR at 50-51, 76, 466. Plaintiff did not

12  know how many seizures she had prior to 2015. *Id.* at 50-51. She typically loses consciousness

13  during her seizures, and she feels upset and very tired after a seizure. *Id.* at 467.

14          Plaintiff testified that she had always lived with her parents because she "can't pay bills

15  or grocery shop by myself," and she is unable to use the stove or the oven. AR at 467, 78.

16  Plaintiff testified that she does not have a driver's license, but that she rides the bus without any

17  difficulty. *Id.* at 53. She helps with laundry and vacuuming at home, and she is able to make a

18  sandwich and to use the microwave. *Id.* at 54. She spends her free time watching television, on

19  her computer, or reading. *Id.* at 473. In her 2018 function report, Plaintiff acknowledged that she

20  is shy and did not go out much, but that she liked to spend time with her sister. *Id.* at 476.

21          In her function report, Plaintiff stated that she is only able to remember simple

22  instructions and has difficulty with spoken instructions. AR at 477. She attested that she is able

23

---

[10] Plaintiff, who is currently represented by counsel, was also represented below in the 2022 proceedings.

to pay attention for approximately thirty minutes at a time, and that stress and change in her routine are difficult. *Id.* at 478. In Plaintiff's opinion, she has no difficulty getting along with others, including supervisors. *Id.*

Plaintiff explained that she had worked at Target for eight years but that she had quit around the time of the 2020 hearing due to the Covid pandemic. AR at 51. She stated that she got the job by working with her job coach, who went to work with her during the time Plaintiff was training for the job. *Id.* at 70-71. Eventually, Plaintiff began doing the job on her own. *Id.* at 71. Her job responsibilities required her to straighten the floor, fold clothes, and return women's clothing to the floor. *Id.* at 51. Around the time of the pandemic, her supervisors changed, and her employer changed Plaintiff's job responsibilities to cleaning. *Id.* at 71, 74, 79. Plaintiff found the cleaning too physically difficult, and she quit the Target job in 2020. *Id.* at 74.

Plaintiff testified that she was never absent from work at Target, and that she got along with everyone at her job. AR at 74. She recalled DVR and Target had involved her parents on occasion when she "wasn't working fast enough and [she] had a hard time pushing heavy carts." *Id.* at 75. Plaintiff never worked more than ten to fifteen hours per week. *Id.* at 80. Plaintiff understood that she was slow at performing tasks at work, which she attributed to her epilepsy and cerebral palsy. *Id.* at 472.

### 3.    *Analysis*

The ALJ rejected both Plaintiff's and her mother K.H.'s testimony regarding Plaintiff's limitations. AR at 24-26, 29-30. Because the ALJ found that Plaintiff presented objective medical evidence establishing that her medically determinable impairments could cause the symptoms alleged, and no affirmative evidence of malingering, the ALJ was required to provide "specific, clear and convincing reasons" for rejecting Plaintiff's symptom testimony concerning

1    the intensity, persistence, and limiting effects of her cognitive and physical impairments.

2    *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting *Smolen v. Chater*, 80 F.3d

3    1273, 1281 (9th Cir. 1996)); *accord Smartt v. Kijakazi*, 53 F.4th 489, 499 (9th Cir. 2022)

4    (confirming that the "clear and convincing" standard continues to apply); *see also* AR at 26.

5            In discounting Plaintiff's own testimony, the ALJ cited to medical records which the ALJ

6    stated showed "little functional limitation;" to Plaintiff's "presentation" at consultative

7    examinations; to the death of Plaintiff's sister in 2020; and to Plaintiff's part-time work at

8    Target. AR at 25. The ALJ, however, failed to explain how the medical records she cited in fact

9    undermined the particular limitations to which Plaintiff testified. *Id.* at 24-26. Moreover, the ALJ

10   improperly cherry-picked notations from Plaintiff's consultative examinations with Drs.

11   McKown and Stamschror, ignoring portions of the records and observations that directly

12   contradicted the ALJ's findings. *Id.* at 25. Additionally, the ALJ's characterization of Plaintiff's

13   stated limitations as "situational" based on Plaintiff's sister's 2020 death due to terminal cancer

14   ignored the long-term nature of Plaintiff's impairments and resulting limitations, and mistakenly

15   relied on a close family member's death to reject Plaintiff's testimony. *Id.*

16           Finally, and perhaps most significantly, the ALJ's finding that Plaintiff's part-time work

17   at Target undermined her testimony and limitations misrepresents the evidence and ignores the

18   law regarding the impact that Plaintiff's job, obtained through a highly structured vocational

19   program and maintained at most twelve to fifteen hours per week, had on her ability to work

20   full-time. As discussed above regarding the vocational evidence, the ALJ failed to adequately

21   consider the extent to which Plaintiff's job at Target, obtained through the DVR vocational

22   training, was "less demanding, more structured, or more supportive than [jobs] in which people

23   typically work" and whether Plaintiff "receive[d] more help than would generally be provided to

ORDER - 25

1   people without [her] impairments," as the ALJ was required to do since Plaintiff was a young

2   adult. *See* SSR 11-2p, 2011 WL 4055665, at \*7-8. For these reasons, the ALJ harmfully erred

3   when she failed to provide adequate reasons for rejecting Plaintiff's testimony.

4           Turning to K.H.'s testimony, the ALJ similarly erred. As with the vocational opinions,

5   the ALJ was also required to consider Plaintiff's mother's testimony in light of the relevant

6   Social Security Ruling, SSR 11-2p. *See* 2011 WL 4055665, at \*7-8. Moreover, for the reasons

7   set forth above regarding the vocational opinions, the Court likewise rejects the Commissioner's

8   argument that the ALJ was not required to consider K.H.'s lay witness opinion under the 2017

9   regulations. Finally, given the similarities in K.H.'s and Plaintiff's testimony, the ALJ's rejection

10  of K.H.'s testimony for the same reasons the ALJ offered in support of rejecting Plaintiff's

11  testimony likewise constituted harmful error. *See* AR at 29 (finding that K.H.'s testimony

12  "generally reflect[ed] the same allegations made by the [Plaintiff]" and was "not entirely

13  consistent with the overall record for the reasons discussed above").

14          **D.      RFC Assessment and Step Five Analysis**

15          Plaintiff also argues that the ALJ erred in the assessment of her RFC and in her step five

16  analysis. Given that the Court has already concluded that the ALJ harmfully erred in her

17  evaluation of the medical opinion evidence, Plaintiff's testimony, Plaintiff's mother's testimony,

18  and in her failure to adequately evaluate the vocational opinion evidence, the ALJ's additional

19  findings at steps four and five must be reconsidered in light of the proceedings on remand. In

20  reassessing Plaintiff's RFC on remand, the ALJ is required to consider SSR 11-2p. *See Heckler*

21  *v. Edwards*, 465 U.S. 870, 873 n.3 (1984) (SSRs are binding on all SSA decision-makers); *Bray*,

22  554 F.3d at 1224 (holding that SSRs "do not carry the 'force of law,' but they are binding on

23  ALJs nonetheless").

1          E.      **Remedy**

2          Plaintiff requests remand for an award of benefits based on the ALJ's alleged errors.

3 (Dkt. # 7 at 18.) Remand for an award of benefits "is a rare and prophylactic exception to the

4 well-established ordinary remand rule." *Leon v. Berryhill*, 880 F.3d 1041, 1044 (9th Cir. 2017).

5 The Ninth Circuit has established a three-step framework for deciding whether a case may be

6 remanded for an award of benefits. *Id.* at 1045. First, the Court must determine whether the ALJ

7 has failed to provide legally sufficient reasons for rejecting evidence. *Id.* (citing *Garrison v.*

8 *Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014)). Second, the Court must determine "whether the

9 record has been fully developed, whether there are outstanding issues that must be resolved

10 before a determination of disability can be made, and whether further administrative proceedings

11 would be useful." *Treichler*, 775 F.3d at 1101. Only if the first two steps were satisfied would

12 the Court consider whether, "if the improperly discredited evidence were credited as true, the

13 ALJ would be required to find the claimant disabled on remand." *Garrison*, 759 F.3d at 1020.

14 "Even if [the Court] reach[es] the third step and credits [the improperly discredited evidence] as

15 true, it is within the court's discretion either to make a direct award of benefits or to remand for

16 further proceedings." *Leon*, 880 F.3d at 1045 (citing *Treichler*, 773 F.3d at 1101).

17          While the Court acknowledges that remand constitutes the third "bite at the apple" for the

18 Commissioner, it nevertheless finds that not all the conditions for an award of benefits are met.

19 Although the ALJ failed to provide sufficient reasons for rejecting medical opinion evidence,

20 vocational evidence, Plaintiff's testimony, and lay witness testimony, it is not clear from the

21 record that the Commissioner is required to find Plaintiff disabled. *See Treichler*, 775 F.3d at

22 1103-04 (instructing that the second prong of credit-as-true test requires a court to "consider

23 whether the record as a whole is free from conflicts, ambiguities, or gaps, whether all factual

issues have been resolved, and whether the claimant's entitlement to benefits is clear under the applicable legal rules"). Rather, the Court finds that further administrative proceedings would be useful to allow the ALJ to reevaluate the improperly rejected medical opinions, to reconsider Plaintiff's and K.H.'s testimony, to consider and explicitly address the vocational opinion evidence, and to reassess Plaintiff's RFC and the step five findings. Accordingly, remand for further administrative proceedings is the proper remedy.

### V.      CONCLUSION

For the foregoing reasons, the Commissioner's final decision is REVERSED, and this case is REMANDED for further administrative proceedings under sentence four of 42 U.S.C. § 405(g). On remand, the ALJ should reevaluate the medical opinion evidence, Plaintiff's and K.H.'s testimony, the vocational opinion evidence, Plaintiff's RFC, and Plaintiff's ability to work at step five.

Dated this 26th day of January, 2024.

MICHELLE L. PETERSON
United States Magistrate Judge